AO-106 (Rev: 06/09)-Application for Search Warrant

# UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

FILED
JUL 16 2024
Heidi D. Campbell, Clerk
U.S. DISTRICT COURT

| | |
|---|---|
| In the Matter of the Search of *3306 Charles Page Blvd,* *Tulsa OK 74127*, the person of *Smokey Leeroy CHANDLER*, and the search of a *silver 2012 Jeep Liberty with OK/LKB139* | ) ) ) ) ) |

Case No. 24-MJ-481-JFJ

**FILED UNDER SEAL**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A"

located in the __Northern__ District of __Oklahoma__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1591(a)(1)(b)(2) and (c) 18 U.S.C. § 2422(b) | **Sex Trafficking of Children** **Coercion or Enticement of a Minor** |

The application is based on these facts:

**See Affidavit of HSI TFO Andrew Titsworth, attached hereto**.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Andrew Titsworth*
*Applicant's signature*

Andrew Titsworth, HSI TFO
*Printed name and title*

Subscribed and sworn to by phone.

Date: 7/16/24

*Jodi Jayne*
*Judge's signature*

City and state: Tulsa, Oklahoma

Jodi F. Jayne, U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| In the Matter of the Search of *3306 Charles Page Blvd, Tulsa OK 74127*, the person of *Smokey Leeroy CHANDLER*, and the search of a *silver 2012 Jeep Liberty with OK/LKB139* | Case No. _____<br><br>**FILED UNDER SEAL** |

### Affidavit in Support of an Application
### Under Rule 41 for a Warrant to Search and Seize

I, Andrew Titsworth, being first duly sworn under oath, depose and state:

### Introduction and Agent Background

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for three separate search warrants for the person, vehicle, and locations specifically described in Attachment A of this affidavit, including:

a. Search Warrant 1: a 2010 Gulf Stream 30' king sport located at 3306 Charles Page Blvd, Tulsa OK 74127, Tulsa County, Northern District of Oklahoma, including outbuildings and vehicles on the curtilage premises ("Subject Residence"); and

b. Search Warrant 2: the person of Smokey Leeroy Chandler, Date of Birth: [xx/xx/1979] ("CHANDLER");

c. Search Warrant 3: the vehicle, a silver 2012 Jeep Liberty with Oklahoma license place LKB139;

the content of electronic storage devices located therein, for contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1591(a)(1)(b)(2), and (c) (Sex Trafficking of Children), 18 U.S.C. § 2422(b) (Coercion or Enticement of a Minor), which items are more specifically described in Attachment B of this affidavit.

2. I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and am authorized to request this search warrant because I am a government agent who is engaged in enforcing federal criminal laws and I am within the category of officers authorized by the Attorney General to request such a warrant. I am a Task Force Officer (TFO) with Homeland Security Investigations (HSI), within the Department of Homeland Security (DHS), assigned to the Tulsa, Oklahoma Resident Agent in Charge Office. I have been so assigned since May 2019. As part of my duties as an HSI TFO, I investigate criminal violations relating to sex trafficking 18 U.S.C. §1591, transporting individuals for prostitution 18 U.S.C. § 2423(a), possession and receipt of child pornography 18 U.S.C. § 2252(a)(1), and coercion and enticement of a child 18 U.S.C. § 2422 and 18 U.S.C. § 1591(a)(1),(b)(2), and (c) Sex Trafficking of Children. Prior to being assigned to the HSI Task Force, I have been a Deputy Sheriff at the Tulsa County Sheriff's Office since December 2010. I completed the HSI TFO training program in Lorton, Virginia, where I received training relative to human trafficking, human smuggling, child exploitation investigations, general smuggling investigations, intellectual property rights,

conspiracy investigations, smuggling of arms and strategic technology, and various surveillance and investigative techniques.

3. I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on my personal observations, knowledge obtained from other law enforcement officers, my review of documents related to this investigation, conversations with others who have personal knowledge of the events and circumstances described herein, and a review of open-source information including information available on the Internet. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact I or others have learned during the course of this investigation.

4. Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that evidence of violations of 18 U.S.C. § 2422(b) (Coercion or Enticement of a Minor), and 18 U.S.C. § 1591(a)(1), (b)(2), and (c) (Sex Trafficking of Children), will be located at the 2010 Gulf Stream 30' king sport located at the West Bend R.V. Outpost, 3306 Charles Page Blvd, Tulsa OK 74127, Tulsa County, Northern District of Oklahoma, including outbuildings and vehicles on the curtilage premises, a silver 2012 Jeep Liberty with Oklahoma license place LKB139, and on the person of Smokey Leeroy CHANDLER, as further described in Attachment A.

3

## Jurisdiction

5. "[A] warrant may be issued to search for and seize any property that constitutes evidence of a criminal offense in violation of the laws of the United States." 18 U.S.C. § 3103a.

6. The requested search is related to the following violations of federal law:

**a. 18 U.S.C. § 2422(b) (Coercion or Enticement of a Minor)**
**b. 18 U.S.C. § 1591 (a)(1), (b)(2), and (c) (Sex Trafficking of Children)**

7. Venue is proper because the person or property described in this affidavit is located within the Northern District of Oklahoma. Fed. R. Crim. P. 41(b)(1).

## Definitions

8. The following definitions, inclusive of all definitions contained in 18 U.S.C. §§ 2246 and 2256, apply to this affidavit and the attachments incorporated herein.

a. The "Internet" is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state;

b. "Internet Protocol address" or "IP address" refers to a unique number used by a computer or electronic device to access the Internet. IP addresses can be dynamic, meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses may also be static, which means the ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet;

4

c. "Electronic Mail," commonly referred to as email (or e-mail), is a method of exchanging digital messages from an author to one or more recipients. Modern email operates across the Internet or other computer networks. Email systems are based on a store-and-forward model; that is, email servers accept, forward, deliver, and store messages. Neither the users nor their computers are required to be online simultaneously; they need only connect briefly, typically to an email server, for as long a period of time as it takes to send or receive messages. One of the most commons methods of obtaining an email account is through a free web-based email service provider such as, Outlook, Yahoo, or Gmail. Anyone with access to the Internet can generally obtain a free web-based email account;

d. A "hash value" or "hash ID" is a unique alpha-numeric identifier for a digital file. A hash value is generated by a mathematical algorithm, based on the file's content. A hash value is a file's "digital fingerprint" or "digital DNA." Two files having identical content will have the same hash value, even if the file names are different. On the other hand, any change to the data in a file, however slight, will change the file's hash value, even if the file name is unchanged. Thus, if two files have the same hash value, they are said to be identical, even if they have different file names;

e. "Cloud storage service" refers to a publicly accessible, online storage provider that can be used to store and share files in large volumes. Users of cloud storage services can share links and associated passwords to their stored files with others in order to grant access to their file collections. Such services allow individuals

5

to easily access these files through a wide variety of electronic devices such as desktop computers, laptops, mobile phones or tablets, from anywhere. Many services provide free access up to a certain size limit;

f. "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years;

g. "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form;

h. "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person; and

i. "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

### Probable Cause

9. In August 2023 Homeland Security Investigations (HSI) Tulsa received information from Cherokee Nation Juvenile Probation Officer, Aariel Green, regarding two juvenile probationers, who independently disclosed to Green that

6

different pimps had taken them to meet with and have sex with men for money, commonly referred to as "Johns." One such pimp was identified as Smokey Leroy CHANDLER.

10. On August 22, 2023, a forensic interview was conducted with minor victim B.W. During the interview, B.W. said that during the time she was reported missing, she attempted to locate some friends in the Tulsa metro area and sent a CashApp payment to a friend for an Uber ride. A silver Jeep SUV arrived to pick up B.W. The Jeep was not a wrangler and had damage to the passenger side with blue tape attached to it.

11. B.W. said that the driver began to make inappropriate comments and introduced himself as Smokey. Smokey took B.W. to his RV near Gilcrease Museum, in an RV park. Agents believe B.W. meant Gilcrease Museum Road since the museum is closed. B.W. reported that there were M30 fentanyl pills in the RV. B.W. explained that she fell asleep in the RV and later woke up in a car driving through Missouri. B.W. believes that she was drugged with a PCP laced marijuana joint she smoked while at Smokey's RV. B.W. stated that when she woke, her vagina hurt, and she believed that she had been raped.

12. B.W. was taken to Texas and Kansas City by Smokey. While staying in Kansas City, B.W. saw that Smokey had nude photos of her on his cellular phone. B.W. knew the photo was of her because of a birth mark near her genitals and a tattoo on her leg.

7

13. Smokey took B.W. to a street in Kansas City and told her to find men to sleep with and what to charge these men. B.W. said while with Smokey in Kansas City she awoke and was being sexually assaulted by four men. After the assault, Smokey took B.W. back to Oklahoma. B.W. said that they stopped at a Kum&Go with a McDonalds over the highway. Investigators know this to be the Will Rogers Archway located in Vinita, Oklahoma. While at the truck stop, B.W. slept with a truck driver for money. B.W. reported that the rate was $250.00 for 15 minutes of sex. B.W. reported that Smokey told her about a twelve (12) year old working for Smokey as a prostitute.

14. B.W. described Smokey as being in his fifties, closely trimmed beard, long and curly blonde/grey/white hair, a spider web tattoo on his elbow. Smokey also works for a company that does roadside repair of semi-trucks. The business card and company that were both green with white lettering.

15. HSI Tulsa conducted a search through the Oklahoma Department of Corrections for white males with spider web elbow tattoos yielded a male with curly hair named Smokey Leeroy CHANDLER 04/04/1979.

16. A search for vehicles registered to CHANDLER revealed that a silver 2012 Jeep Liberty with Oklahoma license plate LKB139 was currently registered to Smokey L CHANDLER, at PO Box 3433 Broken Arrow, OK 74013.

17. An inquiry to the Tulsa Police Department records division revealed that on June 28, 2022 CHANDLER reported a traffic collision (Tulsa Police Report 22-031311) in the silver Jeep Liberty with Oklahoma LKB139. CHANDLER provided

the phone number of 918-_82-1353. The fourth number in the sequence is unable to be identified at this time.

18. A search through the Oklahoma State Courts Network revealed that on June 29, 2023, CHANDLER received a Rogers County traffic citation (TR-2023-1130) for speeding. CHANDLER was operating a 2013 red Chevrolet truck with Oklahoma license plate HEN772. The license plate OK/HEN772 is registered to Martin Turner at 3263 W 73rd Street Tulsa, Oklahoma.

19. On September 13, 2023, surveillance was conducted at 3263 W 73rd Street Tulsa, Oklahoma. A red Chevrolet truck with Oklahoma license plate HEN772 was parked in the driveway. A business sticker was on the two rear windows of the four-door truck. The business sticker was for "Son's of Liberty Mobile Mechanic (479) 650-8638" and had a picture of a person holding a wrench. The words "Son's of Liberty" is written in a bright green color.

20. After HSI Tulsa developed the suspect, a photo array of six photographs was prepared by the Oklahoma State Bureau of Investigations. After reviewing the photographs, B.W. pointed to a photograph and reported that the suspect depicted was the subject she knew as Smokey. The photograph selected by B.W. was of Smokey CHANDLER.

21. In September 2023, minor victim C.M. was released from the Sac & Fox Nation Juvenile Detention Center to Cherokee Nation Probation Officer Green, to travel to the Tulsa Child Advocacy Center for a forensic interview. The Detention Center released the Device to C.M., as C.M. would temporarily be out of Detention

9

Custody. C.M. gave the Device to Probation Officer Green to keep at Cherokee Nation.

22. On February 5, 2024, I met with Officer Green regarding the car ride to the Tulsa Child Advocacy Center. Officer Green stated C.M. showed a photograph of C.M. and an older man kissing and hugging on the Device. The Device was obtained by C.M. around July/August 2023, however, C.M. would not tell Officer Green where the Device came from.

23. Officer Green also stated she met with C.M. a few weeks prior to the forensic interview. C.M. told Officer Green that she was taken out of state. C.M. knew she was out of state because she would look at their location on the Device and then pass out or go to sleep. C.M. told Officer Green that she remembered seeing that they were in Texas. C.M. told Officer Green that she was taken out of state to see what they could get for her.

24. Officer Green stated she believes C.M. is still protective of CHANDLER and did not want to get him in trouble, which based on my training and experience is common behavior for trafficking victims. C.M. told Officer Green girls working for CHANDLER make five hundred dollars for whatever, through my training and experience I have learned that it is common for victims of trafficking to minimize statements about commercial sex acts, even if they do not pertain to the victim. C.M. initially said she did not work for CHANDLER but later said she did.

25. Officer Green said that C.M. had mentioned Facebook casino ads. C.M. told Officer Green if someone clicked the ads and said the correct things, the

applications would open doors to other things. C.M. did not know who was setting

up ads. Through my training and experience I know that criminal enterprises often

operate in code or through hidden applications to conduct criminal activity. By using

these applications and inputting certain phrases or codes, this act of anonymity

allows criminals in the trafficking industry avoid Law Enforcement.

26. On September 8, 2023, a forensic interview was conducted with C.M.

During the interview C.M. disclosed that she had sex with a lot of people for money

in 2022. C.M. made the following statements:

a.  C.M. said in 2023 she met a guy by the name CHANDLER but did not

know his real name. CHANDLER was described as a white male, mid 40s, grey

curly hair, with blue eyes.

b. Smokey openly runs girls in Tulsa and is more demanding. CHANDLER

would not let C.M. leave his trailer. CHANDLER put a bicycle combination lock on

the door, so C.M. could not leave. The longest C.M. was held in the trailer was one

day.

c. CHANDLER would text C.M. and ask C.M. to work for him and make

him money. C.M. said that she worked for Smokey for around a week.

d. C.M. said she mostly slept with CHANDLER for money. When C.M.

would sleep with someone else, CHANDLER would put all the money into profit.

Through my training and experience I know traffickers will keep the proceeds of sex

work and then allow the victim to have small amounts, so the victim still believes the

money belongs to them. C.M. wanted to make money by herself, and this is when Smokey did not want her to leave.

    e. C.M. made approximately thirteen hundred dollars when C.M. was with CHANDLER. The transactions were all cash.

    f. When CHANDLER transported C.M. to someone's house for commercial sex acts, that individual would pay her cash. The money would then be given to Smokey.

    g. CHANDLER drives a work truck for his mechanic business. The truck has a lime green mechanic logo on the side. CHANDLER also has a grey jeep with black leather seats.

    h. C.M. said CHANDLER stayed at the Hall of Fame R.V. Park. When C.M. would connect her phone to the Wi-Fi it say Hall of Fame R.V. Park.

    i. CHANDLER bought C.M. a firearm.

    j. CHANDLER would put meth in front of C.M.

    k. C.M. thinks that CHANDLER gave her something laced with fentanyl. C.M. remembered CHANDLER giving her something blue to smoke and C.M. slept a long time.

    l. CHANDLER has pictures of C.M. in his phone, but only her face.

    27. On September 11, 2023, HSI Tulsa TFO Titsworth and SA Daniel Jones went to Hall of Fame R.V. Park located at 19011 E. Admiral Place, Catoosa, Oklahoma and served a subpoena for current and previous occupants of the R.V. Park. On September 18, 2023, the park provided an occupant listed as "Leroy

Smokey" from July 1, 2023, through September 1, 2023, with a phone number of 918-982-1353. This is consistent with the number provided to TPD on June 28, 2022, where the first number was illegible. Agents were to locate a forwarding address or other information for where Chandler moved after leaving Hall of Fame R.V. Park.

28. Based on the information provided from both forensic interviews, agents looked for R.V. parks matching the physical description near Gilcrease Museum Road. On September 19, 2023, HSI Tulsa SA Daniel Jones went to West Bend R.V. Outpost located at 3306 Charles Page Blvd, Tulsa, OK. SA Jones saw a Jeep Liberty with license plate LKB139 parked in front of a trailer. A few minutes later, SA Jones observed a white male matching the description provided by the victims and matching a driver's license photo of CHANDLER.

29. On September 20, 2023, HSI Tulsa TFO Titsworth and SA Daniel Jones served West Bend R.V. Outpost a subpoena for current residents. On West Bend R.V. On October 2, 2023, the Outpost provided information that CHANDLER was a current occupant since July 18, 2023. The Outpost park does not provide numbered rental spaces for all the rental lots and the area agents observed CHANDLER did not have an identifying number.

30. Cherokee Nation Probation Officer Green transferred the phone to HSI Tulsa custody on January 5, 2024. C.M. was held in the custody of the Sac and Fox Juvenile Detention Center and could not have access to the phone while in detention. The device was stored in a manner in which its contents are, to the extent

13

material to this investigation, in substantially the same state as they were when the device first came into the possession of the Cherokee Nation.

31. On April 24, 2024, HSI Tulsa TFO Titsworth applied for and was granted a search and seizure warrant in the Northern District of Oklahoma for the contents of the device that C.M. had in her possession while with CHANDLER.

32. In May 2024, HSI TFO Titsworth was able to view the forensic download of the device recovered from Cherokee Nation, which minor victim C.M. possessed. Within the phone messages were located between minor victim C.M. and user Smokey at 918-982-1353. The messages are displayed below, the conversation takes place between June 29, 2023 to July 31, 2023, not all messages are mentioned but only those of evidentiary value:

**July 2, 2023**
C.M. : Do you live close to Northside Tulsa?
CHANDLER: its comfycomfy
CHANDLER: why, ya tryna cum lay bck in bed with daddy an chyillax an watch movies
C.M.: I can't tonight because I got a job I got to do.
C.M. : But I was wondering if I could possibly come take a shower at your crib tonight.
CHANDLER: ya gonna let me hit it from the bck
CHANDLER: Im tryna hit that from behind
CHANDLER: shii
C.M. : Man I can't be doing all that.
CHANDLER: why
C.M. :I don't just be fuccin for no reason.
CHANDLER: ur,,funny
C.M. Bruh
CHANDLER: wassup
C.M. : Everytime I try to fucc with someone, they only want me for my body.
CHANDLER: I want you for you
CHANDLER: So,,we mite as well be fuckn
CHANDLER: let me go on an make ya my bitch...ya herd me....
C.M. : I'ts not like that though.

14

CHANDLER: why not
C.M. : Because I'm not ready for anything like that yet.
CHANDLER: whenever ya ready ta get on my level..let me know ….u'll cum pikc ya up ….

33. Later in the day on July 2, 2023 C.M. asks CHANDLER if he can give

C.M. a ride to the sunrise apartment.

CHANDLER asks C.M. "wanna make sum money,,tonite". C.M. declines.
CHANDLER: have that ass ready tomorrow,,cause,,,we fuckn all nite tomorrow nite
CHANDLER: I been drinking all day….aint driving
CHANDLER: unless we fuckn
CHANDLER: Ill cum get ya an we go go fuck in my jeep then I drop ya off at ur crib
   *Officers know that CHANDLER drives a silver Jeep Oklahoma LKB139. The vehicle has been observed at CHANDLER's residence at the West Bend RV Outpost, 3306 Charles Page Blvd Tulsa, OK.*
C.M. : What?
CHANDLER: let me hit from behind,,just toot that ass in the air…an let me hit
C.M. : Omg
CHANDLER: Ill cum pick ya up let me hit an ill take ya home …
C.M. : No.
CHANDLER: enjoy ur eve
C.M. : Aye can you come get me
C.M. : You can hit it and then take me home.
C.M. : Bc these people tryna kill me
C.M. : On Everything I love
C.M. : Text me when you get on the road.
CHANDLER: K

34. The conversation picks back up on July 28, 2023:

CHANDLER: im tryna fuck ur lil homegirl tho

CHANDLER: the one that went to Florida
CHANDLER: wassup with her
CHANDLER: hook me up with her,,,tell her let me go pick her sexy ass up
CHANDLER: tell her ill be her sugar papi,,,,shiiii
C.M.: ohhh homegirl she in Pryor
   *Officers Note: CHANDLER and C.M. are referring to minor victim B.W., which was fifteen (15) years old at the time of the messages.*
CHANDLER: tell her ill go pick her up
C.M.: She don't wanna go.

CHANDLER: tell her she missing money with me
C.M.: I already told her, she don't wanna get down. But I'm ready for the real.
CHANDLER: she said if you dwn she dwn me an you should go get her an ill put ya both on the map
CHANDLER: Ill put ya both on the map
CHANDLER: both you 2 can be me girls
CHANDLER: but ur gonna be my main,,she gonna be me an urs,,ya herd me….she is ours…..ill show you an her how ta get this money

*Officers note: from my training and experience I know the terms used above to*

*"put ya both on the map," "get tjos money" is synonymous with individuals*

*transporting victims to engage in the act of prostitution. Further, it is common for*

*human traffickers to recruit and employ a female the "main" or "bottom" to help*

*manage and recruit other females for commercial sex acts.*

CHANDLER: when ya want me to cum pic ur ass up,,then we can go pick her up….
CHANDLER: me you an her gonna have 3sums evernite before bed,,,shiiii
CHANDLER: u two just gonna be stayn with me from now on anyways,, shit
CHANDLER: both y'all get all ur clothes an stuff packed up an read,,,
C.M.: Okay
CHANDLER: u know ima have ta pull over an fuck ur sexy ass on the way to get her in prior
CHANDLER: we fucking rite when I pick u up then we headed to prior to pick ur up
CHANDLER: rite when I pick u up,,me an u pulling over an fucking,,,then we going to pick her up in prior….an going back ta my crib
C.M.: I bett
CHANDLER: then we taken shots an smkn blunts an having a 3sum all nite long
CHANDLER: then when we wake up the next day we loading up in my car and going to make money….easy money

*Officers note: from my training and experience I know the terms used above to*

*"load up in CHANDLER's car and make money" is synonymous with individuals*

*transporting victims to engage in the act of prostitution.*

CHANDLER: im show you two how we gonna get this money,,,,shiiii
CHANDLER: then we going shopping for new shoes clothe panties an bra,,an then going back to the casa for the nite an wake up everyday an getting this money out here…an stackn

*Officers note: from my training and experience I know it is common for*

*human traffickers to recruit women by offering to buy them clothes and other gifts.*

CHANDLER: ima take care of you two,,an gonna show ya how to get this money,,with DADDY
C.M.: Betttt daddy
CHANDLER: u,,two sexy ladys ready for daddy to cum pikc your asses up.....
C.M.: Did you get ahold of Bri?
CHANDLER: she ready ta come get ya an we go back ta my crib an have a 3sum
CHANDLER: she ready ta start making this money
C.M.: I'm on ankle monitor by the way so I can't be doing anything sketchy. But I can cut this mf off.
C.M.: Do you think you'll be able to come get me like right now?
CHANDLER: sen me address,,ill come pick ya up
CHANDLER: im pulling over on the way bck to Tulsa an beating ur pussy up,,ur gonna toot that ass in the air an let me beat that pussy up doggystyles in my car on the way to tulsa
C.M.: Okay. We can do it when we get to Tulsa, we gon have to dip outa her on me

**July 30, 2023**
C.M. : Hey i'm in Tulsa!!
CHANDLER: u both ready ta have a 3sum with daddy
C.M. : yeah you gotta get her first, she's in bixby
CHANDLER: get ur sexy ass ready an we gonna come pick ya up,, ima jump in the shower,,,she getting ready,, she gonna send a pic when she ready
The conversation ends with C.M. asking where CHANDLER is at and if B.W. is ok.

35.  On July 11, 2024, HSI Tulsa TFO Titsworth went to West Bend R.V.

Outpost. HSI Tulsa TFO Titsworth saw the same Jeep Liberty parked outside of the same

trailer. CHANDLER's property is confined within the third unmarked parking lines along

the southeast edge of the park next to the levy.

### Common Practices of Persons Who Unlawfully Engage in Sex Trafficking

36. Based on my previous investigative experience related to sex trafficking

investigations, and the training and experience of other law enforcement officers with

whom I have had discussions, I know there are certain characteristics common to individuals who engage in sex trafficking:

a. Persons who perform sex work for value—sex workers—are often trafficked by someone known as a "pimp" or "madam." The pimp and sex worker represent the supply side of sex trafficking. The buyer seeking and paying for commercial sex represents the demand side of sex trafficking.

b. In most circumstances, the pimp is a third party who offers to provide physical protection for the sex worker and assist the sex worker in advertising her services and making sure she has food, shelter, and transportation to the locations where the unlawful commercial sexual activity is to occur. When a pimp is involved, the sex worker typically gives all the proceeds she earns from commercial sex to the pimp. A pimp typically utilizes various methods of control—both psychological and physical—to ensure compliance. However, sex trafficking also occurs when parents or guardians act as a pimp to sell their children to others for sex. Many times those situations arise when parents or guardians have a history in the sex trade and/or have drug or alcohol dependencies and exploit their children to satisfy their addictions.

c. Sex traffickers almost always rely upon cellular telephones and computers to facilitate their business. Persons engaging in sex trafficking frequently communicate through text messaging, social media, email, and voice communications via cellular phones. Additionally, sex traffickers use the same

methods of communication to recruit and control victims, advertise, connect between supply and demand, dispatch sex workers to meet with potential buyers, discuss prices and meeting arrangements, communicate threats or promises to victims and buyers, and arrange for the acquisition, transportation, and laundering of proceeds generated from these illegal activities. They frequently maintain text messages, social media messages, and voice communications for long periods of time. In many cases, a sex trafficking victim will have a phone with her for a commercial sex transaction with an open and live call with the pimp, who listens to and monitors the encounter. In many instances, sex workers will use internet- and social media-based telephone numbers.

d. Traffickers and sex workers/victims frequently take and store photographs and video recordings on their cellular devices and/or computer and transmit those photos and videos via social media applications and the internet. These photographs often include photographs of the sex workers/victims, both sexually explicit and non-explicit, that can be posted as advertisements for unlawful commercial sexual activity. Buyers and sex workers frequently exchange photos for identification purposes, and supply-side participants frequently document their proceeds from unlawful commercial sex activities in what are referred to as "trophy photos." These photos/videos also often include other sex workers, pimps, buyers and/or their associates.

19

e. Those that conspire or conduct transactions relating to human trafficking and/or unlawful commercial sex often identify themselves by monikers, street names, and/or nicknames to hinder law enforcement's efforts in identifying those involved with the commercial sex.

f. Sex workers and traffickers—both pimps and buyers—will often use coded words and phrases and vague conversations to discuss their plans and prevent anyone from overhearing their conversations and from recognizing that the conversations concern a commercial sex act.

g. Commercial sex acts are commonly conducted at hotels or motels. Traffickers will rent a room where they can maintain security and control of the commercial sexual transactions.

h. A prospective buyer will often call or send a message to the sex worker to obtain permission to come to a location, i.e. hotel, residence, etc., to engage and/or solicit in the sexual encounter. The individuals typically use coded language to discuss what they are seeking and offering. For example, payment is frequently described as a "donation," and dollars are sometimes called "roses." Other codes are used to discuss specific sex acts, but agreements are generally reached based on the increment of time—a quick visit (qv), half hour (hh), or full hour (hr).

i. Sex trafficking victims and sex workers are frequently advertised on a variety of social media platforms. These websites, applications, and platforms are

often accessed by smartphones, cell phones, computers, and other similar devices. individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity;

## Background on Computers, the Internet, and Email

37. I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience, and knowledge, I know the following:

a. Computers, smartphones[1] and digital technology are the primary way in which individuals interested in child pornography interact with each other. Computers and smartphones basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

b. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Mobile devices such as smartphones and tablet computers may also connect to other computers via

---

[1] Smartphones are a class of mobile phones and of multi-purpose mobile computing devices. They are distinguished from feature phones by their stronger hardware capabilities and extensive mobile operating systems, which facilitate wider software, internet (including web browsing over mobile broadband), and multimedia functionality (including music, video, cameras, and gaming), alongside core phone functions such as voice calls and text messaging.

wireless connections. Electronic contact can be made to literally millions of computers and smartphones and tablets around the world.

     c. The phone's ability to store images in digital form makes it an ideal repository for child pornography. It is extremely easy for an individual to take a photo or a video with a camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Smartphones and/or mobile phones are also almost always carried on an individual's person (or within their immediate dominion and control) and can additionally store media;

     d. As is the case with most digital technology, communications by way of computer or smartphone can be saved or stored on the computer or smartphone used for these purposes. Storing this information can be intentional (i.e., by saving an e-mail as a file on the computer or smartphone, or saving the location of one's favorite websites in, for example, "bookmarked" files). Digital information can also be retained unintentionally such as the traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer or smartphone user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

### Specifics of Search and Seizure of Computer Systems

38. As described above and in Attachment B, this application seeks permission to search for records that might be found on the Subject Residence, and/or the person of Smokey Leeroy CHANDLER in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media, such as a cellular phone, smartphone, or tablet. Thus, the warrants applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

39. I submit that if a computer or storage medium is found on the Subject Residence, and/or the person of Smokey Leeroy CHANDER, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data;

23

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file;

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information;

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

40. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrants, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any

storage medium in the Subject Residence, and/or the person of Smokey Leeroy
CHANDLER because:

    a. Data on the storage medium can provide evidence of a file that was once on
the storage medium but has since been deleted or edited, or of a deleted
portion of a file (such as a paragraph that has been deleted from a word
processing file). Virtual memory paging systems can leave traces of
information on the storage medium that show what tasks and processes were
recently active. Web browsers, e-mail programs, and chat programs store
configuration information on the storage medium that can reveal information
such as online nicknames and passwords. Operating systems can record
additional information, such as the attachment of peripherals, the attachment
of USB flash storage devices or other external storage media, and the times the
computer was in use. Computer file systems can record information about the
dates files were created and the sequence in which they were created, although
this information can later be falsified;

    b. As explained herein, information stored within a computer and other
electronic storage media may provide crucial evidence of the "who, what,
why, when, where, and how" of the criminal conduct under investigation,
thus enabling the United States to establish and prove each element or
alternatively, to exclude the innocent from further suspicion. In my training
and experience, information stored within a computer or storage media (e.g.,

registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that logs the following: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file

26

or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement);

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when;

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to

investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant;

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent;

f. I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

41. Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of computer systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, SIM cards, cellular phones capable of storage, smartphones, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software website, or operating system that is being searched;

b. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since

29

computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or

30

encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

42. Additionally, based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of so-called "wireless routers," which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or "unsecured" (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

31

43. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrants and would authorize a later review of the media or information consistent with the warrants. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrants.

## Conclusion

44. Based on the information set forth in this affidavit, I submit there is probable cause to believe that 18 U.S.C. § 1591(a)(1)(b)(2), and (c) (Sex Trafficking of Children), 18 U.S.C. § 2422(b) (Coercion or Enticement of a Minor) has been violated, and that the contraband, property, evidence, fruits and instrumentalities of this offense, more fully described in Attachment B, are located at the sites described in Attachment A. I respectfully request that this Court issue search warrants for the locations described in Attachment A, authorizing the search and seizure of the items described in Attachment B.

45. I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab; digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered from the premises. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

Respectfully submitted,

*Andrew Titsworth*

Andrew Titsworth
Task Force Officer
Homeland Security Investigations

Subscribed and sworn to by phone on July __16th__, 2024.

JODI F. JAYNE
UNITED STATES MAGISTRATE JUDGE

33

**ATTACHMENT A-1**

**Property to be Searched**

The property to be searched is a residence located at West Bend R.V. Outpost, 3306 Charles Page Blvd, Tulsa OK 74127, Tulsa County, Northern District of Oklahoma, third unmarked parking lines along the southeast edge of the park next to the levy, including outbuildings and vehicles on the curtilage premises ("Subject Residence"), Tulsa County, Northern District of Oklahoma, including outbuildings and vehicles on the curtilage premises, further described as a 2010 Gulf Stream 30' king sport RV that appears to have a two tone siding, a white upper siding with grey siding located around the bottom. The front door of the RV faces east.

The premises to be searched is located within the Northern District of Oklahoma, pictured below:




## ATTACHMENT A-2

### Person to be Searched

This warrant applies to the person of Smokey Leeroy CHANDLER, date of birth XX/XX/1979, who is listed on his driver's license as 5'9" tall, weighing 178 pounds and having grey hair and blue eyes, and who is pictured below:



## ATTACHMENT A-3

### Property to be Searched

This warrant applies to the vehicle, a silver 2012 Jeep Liberty with Oklahoma license plate LKB139. The vehicle has body damage to the right rear door, with blue pieces of tape in the area of damage. The vehicle to be searched is located within the Northern District of Oklahoma, pictured below:



## ATTACHMENT B

### Particular Things to be Seized

All items that constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2422(b) (Coercion or Enticement of a Minor) 18 U.S.C. § 1591(a)(1)(b)(2), and (c) (Sex Trafficking of Children) involving Smokey Leeroy CHANDLER, including:

A.     Images/videos/gifs of child pornography or child erotica; files containing images/videos/gifs; and data of any type relating to the sexual exploitation of minors or a sexual interest in children, material related to the possession thereof, and data of any type related to any person employing, using, persuading, inducing, enticing, or coercing any minor to engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting such visual depiction of such conduct, Images/videos/gifs consistent with the advertisement of an individual for commercial sex acts, to include the trafficking or buying of individuals, in any form wherever it may be stored or found including, but not limited to:

i. Any cellular telephone, smartphone, tablet, personal digital assistant, computer, computer system and related peripherals; computer hardware; computer software; tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software

operating manuals, tape systems and hard drive and other computer related operation equipment, digital cameras, scanners, monitors, printers, external storage devices, routers, modems, computer photographs, Graphic Interchange formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI, and MPEG), and any electronic data storage devices including, but not limited to hardware, software, flash memory devices, and other storage mediums; any input/output peripheral devices, including but not limited to computer passwords and data security devices and computer-related documentation, and any hardware/software manuals related to or used to: visually depict child pornography; contain information pertaining to the interest in child pornography; and/or distribute, receive, or possess child pornography, or information pertaining to an interest in child pornography, or information pertaining to an interest in child pornography; and/or the advertisement or solicitation of an individual for commercial sex acts.

ii. Books and magazines containing visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256 or relating to the sexual exploitation of minors or a sexual interest in children;

2

iii.     Originals, copies, and negatives of visual depictions of minors engaged

in sexually explicit conduct, as defined in 18 U.S.C. § 2256 or relating to the

sexual exploitation of minors or a sexual interest in children; and

iv.     Stories, text-based files, motion pictures, films, videos, and other

recordings of visual depictions of minors engaged in sexually explicit conduct,

as defined in 18 U.S.C. § 2256 or relating to the sexual exploitation of minors

or a sexual interest in children;

B.     Information, correspondence, records, documents or other materials

pertaining to the possession, receipt or distribution of visual depictions of minors

engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or pertaining to

the sexual exploitation of minors or a sexual interest in children, or the

transportation or facilitation of a minor for commercial sex acts, that were

transmitted or received using computer, cellular device, personal digital assistant, or

some other facility or means of interstate or foreign commerce, common carrier, or

the U.S. mail including, but not limited to:

i. Envelopes, letters, and other correspondence including, but not limited to,

electronic mail, chat logs, and electronic messages, establishing possession,

access to, or transmission through interstate or foreign commerce, including

by United States mail or by computer, of visual depictions of minors engaged

in sexually explicit conduct, as defined in 18 U.S.C. § 2256 or relating to the

sexual exploitation of minors or a sexual interest in children;

ii. Books, ledgers, and records bearing on the production, reproduction,

receipt, shipment, orders, requests, trades, purchases, or transactions of any

kind involving the transmission through interstate or foreign commerce

including by United States mail or by computer of any visual depiction of

minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256 or

relating to the sexual exploitation of minors or a sexual interest in children;

iii.     Any and all records, documents, or materials, including any and all

address books, mailing lists, supplier lists, mailing address labels, and any and

all documents and records pertaining to the preparation, purchase, and

acquisition of names or lists of names to be used in connection with the

purchase, sale, trade, or transmission, through interstate commerce including

by United States mail or by computer, any visual depiction of a minor engaged

in sexually explicit conduct, as defined in Title 18, United States Code,

Section 2256 or relating to the sexual exploitation of minors or a sexual

interest in children;

iv.     Any and all records, documents, or materials, including any and all

address books, names, and lists of names and addresses of minors visually

depicted while engaging in sexually explicit conduct, defined in Title 18,

United States Code, Section 2256; or relating to the sexual exploitation of minors or a sexual interest in children;

v.      Any and all records of Internet usage including user names and e-mail addresses and identities assumed for the purposes of communication on the Internet. These records may include billing and subscriber records, chat room logs, e-mail messages, and include electronic files in a computer and on other data storage mediums, including CDs or DVDs;

vi.      Any physical keys, encryption devices, dongles and similar physical items necessary to access computer equipment, storage devices or data;

vii.      Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data; and

viii.      Files, records, programs, logs, electronic communications, scanning programs, financial records, hacking software, or router configuration software;

C.      Credit card information including, but not limited to, bills and payment records, and including, but not limited to, records of internet access, payment for gasoline, hotel/motel rooms, tolls, and advertisement websites, and records of the purchase of items such connected to commercial sex acts like condoms;

5

D.      Records evidencing occupancy or ownership of the premises described above, including, but not limited to, utility and telephone bills, mail envelopes, or addressed correspondence;

E.      Records or other items which evidence ownership or use of computer equipment or any of the devices described in this attachment that are found in the above residence, including, but not limited to, sales receipts, bills for Internet access, and handwritten notes;

F.      Any and all adapters, chargers or other hardware items necessary to charge the battery, or to maintain the functioning of, any of the equipment described above; and

G.      Any data or materials establishing ownership, use or control of any computer equipment seized from 3306 Charles Page Blvd., Tulsa, Oklahoma.

H.      Any and all information, correspondence (including emails and text messages), records, documents and/or other materials related to contacts, in whatever form, with minors involving the production, possession and/or distribution of child pornography, the attempt or act of educing, enticing, coercing, or persuading a minor to engage in sexual acts, and the advertisement or transportation of an individual for commercial sex acts.

I.      Photographs of tattoos and unique scars or birth marks on CHANDLER. Particularly a spider web tattoo on CHANDLER's elbow.

6

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, SIM cards, cellular phones capable of storage, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.